BREWSTER
v.
GELSTON.

BREWSTER *against* GELSTON.

Under the 91st section of the act of congress (passed *March* 2d, 1799,) for the collection of duties, to entitle an officer of a revenue cutter to a share of the forfeiture, the information given by him must be of such a nature as to conduce essentially, altho' not independently of other evidence, to a condemnation.

The mere naked seizure of a vessel by the officers of a revenue cutter does not give any right to a share of the forfeiture.

The settlement of the collector's accounts, respecting the proceeds and distribution of forfeitures, and the expenses attending condemnation, at the treasury of the United States, is to be received as *prima facie* evidence of the fairness and correctness of such settlement.

THIS was an action of *assumpsit*, brought to recover the plaintiff's share, as informer and seizer of the ship *Magistrate*, and of the ship *Liberty*, and their cargoes, and of the schooner *Hiram* and her cargo. The declaration contained the common money counts, and the plaintiff's bill of particulars stated the different sums demanded. The defendant is the collector of customs of the port of *New-York*, and the plaintiff commanded the revenue cutter *Active*, employed by the custom-house.

The cause was tried at the *New-York* sittings, in *July*, 1812, before his honour, the late Chief Justice.

As to the schooner *Hiram:* Lemuel Ferris, master of the *Eglantine*, on the part of the plaintiff, testified, that coming through the *Sound*, he observed the schooner *Hiram*, and passed her near *Byram Point;* that in the morning of the day after his arrival in *New-York*, (about the 1st of *December*, 1808,) the plaintiff came on board, and he informed the plaintiff that he had seen a schooner in the *Sound*, and suspected her to be a smuggler; that in the evening of that day he was sent for by the plaintiff, to look at a schooner lying at the *Old Slip*, supposed to be the same which he had seen in the *Sound*, and which he thought was the same; but that he heard *Andrew Mead* say, (as was confirmed by *Lockwood*, the next witness,) that it was not the vessel they were searching for, and that he heard *Peter A. Schenck*, the surveyor of the port of *New-York*, say, that they had seized the wrong vessel; that the vessel they were looking for was the *Phœbe;* that about noon of the day after his arrival, he saw *Luke Mead* arrive, and that he saw the suspected vessel arrive in *New-York*, about the noon of the same day. Whether the day after his arrival was *Friday* or *Saturday*, the witness did not know.

*Epenetus Lockwood*, who was on board of the *Eglantine* with *Ferris*, when he observed the *Hiram*, confirmed *Ferris's* statement, as to the conversation between him and the plaintiff.

*William Isaacs*, also on the part of the plaintiff, testified, that the revenue cutter *Active*, of which the plaintiff was master,

ALBANY,
August, 1814.

BREWSTER
v.
GRISTON.

laying off the *Old Slip*, the plaintiff took *Andrew Mead* on board of his boat; that the plaintiff told *Mead* that he was going to look for a schooner that had come through the *Sound* ; that they found the schooner *Hiram* that evening, which was *Saturday*, and that, consequently, they did not examine the vessel before *Monday;* that when they seized the vessel, *Andrew Mead* said, that it was not the vessel he was looking for; that on searching the vessel, the plaintiff discovered (as was also testified by *Andrew Mead*) a quantity of dry goods in a cask, lashed on the quarter deck of the vessel as a water cask, and he also discovered some goods concealed in the after-run of the vessel.

*Luke Mead*, on the part of the defendant, testified, that he saw the *Hiram* come to at *Byram Point*, in the evening, and land goods in a boat; that he arrived in *New-York* the next day, on or about the 1st of *December*, 1808, he thinks it was on *Friday*, about noon; that shortly after his arrival, he met with a Mr. *Scudder*, a custom-house officer, who took him to the custom-house, and introduced him to the defendant and *Peter A. Schenck*, (which *Scudder*, on being examined, confirmed,) where he related what he had seen, and was directed to go and look for the vessel, and was told that he would be considered as an informer; that he went to the dock, and there met with *Andrew Mead;* that they both went to the custom-house, and were again directed to search for the vessel ; that *Andrew Mead* went in search of her, and witness went about some other business; that he did not mention the name of the vessel at the custom-house, but believed he said that it was the *Phœbe*, which he supposed to be her name. That some time after the seizure, the plaintiff, in a conversation with the witness, observed, that the witness would receive something handsome, as informer, and that when he received his money, he ought to make a present to *Ferris* and *Lockwood* for their assistance; that the plaintiff did not pretend that he had any claim as informer, which conversation was confirmed by the next witness.

*Andrew Mead*, on the part of the defendant, testified that when he went with *Luke Mead* to the custom-house, he was directed to go and search for the schooner and the plaintiff, and to direct him to seize her. That he saw the plaintiff near night, on *Friday*, and told him the order of Mr. *Schenck*; that the plaintiff asked the witness her name, which he suggested to be the

*Phœbe;* that he went in a boat with the plaintiff, *Lockwood,* and others, and rowed along the docks, looking for the schooner; that they found her in the evening, and seized her; that the plaintiff was, at first, doubtful, but the next morning said to the witness that they had got the right vessel; that the plaintiff did not pretend to any knowledge of the vessel having been smuggling, previous to the witness's communication.

*Peter A. Schenck,* on the part of the defendant, confirmed *Luke Mead's* statement, as to what passed at the custom-house, between him and *Luke* and *Andrew Mead,* which was on *Friday,* the 2d of *December,* 1808. He testified that he did not remember that he had ever said that they had seized the wrong vessel, or that the vessel they ought to have seized was the *Phœbe;* that he could not have said so, as her name was not mentioned to him. That the vessel was seized on *Friday* night, and was examined on *Saturday.* That on *Sunday,* he received information from the defendant, that there were some pieces of linen concealed in the ceiling of the cabin; that he went on board on *Sunday,* made the search, and found the linen in the place described by the defendant.

*Jeremiah Mead* declared, that he had heard the plaintiff say, that the first information he had of the *Hiram,* was from the orders of Mr. *Schenck,* through *Andrew Mead,* but that he said the orders were not in writing, and he was not bound to obey them.

As to the ship *Magistrate :* it was proved, on the part of the plaintiff, that *Squires,* the first lieutenant of the cutter *Active,* went with the cutter's boat after the *Magistrate,* which they overtook in the bay, and stopped her; that they went into the cabin with the captain, and the captain, with his papers, came on shore, and went with *Squires* to the custom-house. That the *Magistrate* was taken charge of, for some days, by the men of the *Active,* and her sails were unbent; and, as one witness testified, put into the public store by the men of the *Active,* which, however, was denied by *Peter A. Schenck,* who stated that they were not put into the public store, but were, as he believed, stolen, or taken away by some of the *Magistrate's* crew.

*Peter A. Schenck,* for the defendant, testified that he and the defendant observed the *Magistrate* going from *Powles-Hook*

down the bay; that shortly after they saw her, *Squires* came to the custom-house, and the defendant ordered him to go and examine her papers, and if he found any thing wrong to stop her; that a few minutes after *Squires* left the custom-house, he directed *Sickles* to go and tell him to stop her at all events, which message *Sickles* testified that he delivered; that shortly after, *Squires* and the captain of the *Magistrate* came to the custom-house; and on inquiry of the captain, it was discovered that he had not given to the collector of *Amboy* the bond required by the act which had just then been passed, called the *enforcing act;* that there was some conversation and negotiation about giving the bond to the defendant; that in the course of the negotiation the captain of the *Magistrate,* who was also the owner, admitted that he was a foreigner by birth, but said that he had been naturalized; and on being requested to produce his certificate of naturalization, which he professed to have in his power, he either could not, or did not produce it. The witness said that *Squires* and *Gilpin,* the other lieutenant of the *Active,* never pretended to have any right, and frequently disowned to have any claim to the *Magistrate* or to the *Liberty.*

As to the *Liberty :* it was proved by several witnesses, that the defendant, having suspicion that the captain and crew of the *Liberty* intended to run away with her, had her watched by the officers of the customs, and that the crew of the *Active* assisted in watching her and in unbending her sails, which were taken on shore. One witness stated, that on *Sunday* evening, in a violent snow storm, *Schenck* told the custom-house officers, that they need not watch her that night, as no vessel would attempt to stir in such a storm; but it was proved, that on that night, the captain and crew of the *Liberty* cut her fasts, and went off with her. It was proved by *Peter A. Schenck,* and another witness on the part of the defendant, and not denied, but rather confirmed on the part of the plaintiff, that *Schenck,* having been informed that the *Liberty* had gone, went to the *Active* and gave *Gilpin* the information, and requested him to go after her; that he seemed very unwilling to go, and made many objections, but that *Schenck* told him he must go, and that if he wanted any additional hands they should be procured, and he procured five or six additional hands and put them on board; that *Gilpin* still objected to going, until he could see *Squires* and the defendant, or one of them, and that he went on shore for the professed

ALBANY,
August, 1814.

BREWSTER
v.
GELSTON.

purpose of consulting one or both of them. *Schenck* also stated, that shortly after, he went to the house of the defendant, and that as he was going in, he met *Gilpin* coming out, and that having stayed there a few minutes, the witness returned to the cutter and found them in the act of going off. It was further proved, that the cutter *Active* went after the *Liberty* that night, and came to anchor under one of the islands in the bay; that they did not see the *Liberty* that night, but as they were returning to *New-York*, she was seen ashore at *Governor's Island*, but they did not then go to her.

*Jonathan L. Brewster*, a witness for the plaintiff, and who was on board of the *Active*, testified, that as they approached the dock, on their return, they saw *Squires* on the dock; that he hailed the cutter, and asked whether the ship on *Governor's Island* was the *Liberty*; and they answered that it was; that he then ordered them to get the boat out to go on board of her; but while they were getting the boat ready, *William Van Beuren*, the master of the cutter *Protector*, invited *Squires* to go with him in his boat, as she was ready; but this statement was denied by a witness for the defendant, who was also on board the *Active*; that *Squires* went with *Van Beuren*; that *Squires* procured lighters; and it was stated by several witnesses for the plaintiff, that *Squires* took charge of the *Liberty*, and that she was unloaded by the *Active's* crew, who were set to work by *Squires*.

Two of the crew of the *Active* testified, that they went, by order of *Squires*, in the *Protector's* boat, with him, *Van Beuren*, and two of the *Protector's* crew, and assisted in rowing her. One of these witnesses testified, that he was on board of the *Protector* when the *Active* returned in the morning; that *Squires* was on board of the *Protector* first, and before he saw *Van Beuren*, directed the witness to go into the boat, to go on board of the *Liberty*.

*William Van Beuren*, for the defendant, testified, that early in the morning after the *Liberty* escaped, he observed a ship which he supposed to be the *Liberty*, on shore on *Governor's Island*; that he immediately ordered his boat to be manned; that, just before he sailed, he saw *Squires*, and invited him to go along; that they went on board, took possession of her, and left one of his men in charge of her; the witness could not tell whether the *Active* had come up before his boat went off, but denied his

hailing her, and did not think that any one hailed her. The witness stated, that he had determined to go off before he saw *Squires ;* but that he went for him and saw him on some dock.

*Nathaniel Shultz,* a witness on the part of the defendant, testified, that he was the clerk of the defendant, as collector, and kept his books. The witness produced an account, as an extract from those books, by which it appeared, that the sum of two thousand seven hundred and fifty-five dollars and thirty-five cents, had been paid by the defendant, as the expenses incurred in and about the *Liberty* and her cargo. He testified, that the account had been allowed and settled at the treasury of the *United States ;* he produced duplicates of all the items of the account, except for about eight hundred dollars, of which he stated that no duplicate had been received, and the original vouchers were filed at *Washington.* The witness testified that the defendant paid into the treasury, or to the *Manhattan Bank,* to the credit of the treasurer of the *United States,* all the money in his hands, belonging to the *United States,* every three months ; that one moiety of the sums received from the marshal, as the proceeds of the *Liberty* and *Magistrate,* and their cargoes, had, after deducting the said sum of two thousand seven hundred and fifty-five dollars and thirty-five cents, from the sum received, as the proceeds of the *Liberty* and cargo, and after deducting a small sum for the expenses chargeable on the proceeds of the *Magistrate* and cargo, been paid to the credit of the *United States,* and two thirds of the remainder had been paid to the naval officer and surveyor of the district of *New-York.*

The *Chief Justice,* in his charge to the jury, remarked, that the plaintiff's claim, if at all, must be supported under the 91st section of the duty act, and that the law ought to be construed benignly in his favour. He decided, and charged the jury, that the plaintiff was not bound by the allowance and settlement of the defendant's accounts by the officer of the treasury ; and that he had a right to object to the deductions claimed by the defendant, on account of the expenses, notwithstanding such allowance and settlement ; and the jury found a verdict for the plaintiff accordingly.

A motion was made to set aside the verdict, and for a new trial : 1. Because the verdict was against evidence : 2. Because of the misdirection of the judge.

Baldwin and Wells, for the defendant.

T. A. Emmet, contra.

VAN NESS, J. delivered the opinion of the court. By the 91st section of the act of congress for the collection of duties, (passed the 2d of March, 1799,) it is enacted that " all fines, penalties, and forfeitures, recovered by virtue of this act, (and not otherwise appropriated,) shall, after deducting all proper costs and charges, be disposed of as follows: One moiety shall be for the use of the United States, and be paid into the treasury thereof by the collector receiving the same; the other moiety shall be divided between, and paid in equal proportions to the collector, and naval officer of the district, and surveyor of the port wherein the same shall have been incurred, or to such of the said officers as there may be in the said district; and in districts where only one of the aforesaid officers shall have been established, the said moiety shall be given to such officer; provided. nevertheless, that in all cases where such penalties, fines, and forfeitures, shall be recovered in pursuance of information given to such collectors, by any person other than the naval officer or surveyor of the district, the one half of such moiety shall be given to such informer, and the remainder thereof shall be disposed of between the collector, naval officer, and surveyor or surveyors, in manner aforesaid: Provided also, that where any fines, forfeitures, and penalties, incurred by virtue of this act, are recovered in consequence of any information given by any officer of a revenue cutter, they shall, after deducting all proper costs and charges, be disposed of as follows: One fourth part shall be for the use of the United States, and paid into the treasury thereof, in manner as before directed; one fourth part for the officers of the customs, to be distributed as herein before set forth, and the remainder thereof to the officers of the cutter, to be divided among them agreeably to their pay."

The present claim, I presume, is founded upon the last proviso. Whether the same information is not contemplated by both these provisos is uncertain; neither is it very material to the decision of this cause, in the view I have taken of it.

The information to be given by an officer of a revenue cutter must be of such a nature as to conduce to a final condemna-

tion. It must be such as, in the first instance, to lead to, and, perhaps, justify a seizure, and the commencement of a suit; and if such suit eventuates in a condemnation, the officers are entitled to their share. I do not apprehend that it is required that this information must consist of such facts or circumstances as, independently of all other evidence, would be sufficient to produce a condemnation, though it ought to be such as essentially to contribute thereto.

With these general principles for our guide, let us see whether the verdict of the jury, in the three different cases of forfeitures, is against the weight of evidence or not; and I will consider them in the order they were presented by the counsel for the defendant. First, as to the *Hiram:*

The plaintiff, in the morning of the same day, early in *December*, received information which led him to suspect that this vessel was a smuggler, as appears by the uncontradicted testimony of *Ferris* and *Lockwood;* and this information was communicated to him before *Luke Mead's* arrival at the city of *New-York;* upon this the plaintiff went in search of this vessel in his boat, accompanied, among others, by *Andrew Mead*, and, in the evening, having found the *Hiram*, he seized her, and, on search, goods were found concealed on board of her, in such a manner as to leave no doubt that she was engaged in some unlawful trade or business. Upon what ground, or upon whose testimony she was condemned, does not appear in the case. Laying *Luke Mead's* communication to the collector out of the case, there can be no doubt that she was finally forfeited to the *United States*, in consequence of the information given by the plaintiff. In opposition to this, it appears that the first information given to the collector was by *Luke Mead*, who, together with *Andrew Mead*, went in search of her. They, however, supposed the offending vessel to be the *Phœbe, Merrit* master, and not the *Hiram, Seely* master. *Luke Mead* appears soon to have gone off on other business, leaving *Andrew Mead* to prosecute the search. *Andrew Mead's* presence, when the vessel was seized, cannot, in any way, prejudice the rights of the plaintiff, nor admit him to participate in the forfeiture, particularly, as he declared, when the plaintiff discovered the *Hiram*, that she was not the vessel he was in search of. There is some further testimony in support of *Luke Mead's* claim, all of which was submitted to the jury. The question is, whether the

jury were not justified in concluding that the condemnation was had in consequence of the information given by the plaintiff, rather than that given by *Luke Mead*. This was a question of fact, and though I am unable to say on which side the weight of evidence lies, the jury have found in favour of the plaintiff; and this is not a case where it would be proper for the court to interfere.

If the information communicated by *Mead* had been followed up by a seizure of the vessel, and a condemnation had ensued, he would have had a right to a share of the forfeiture. The only fact which he disclosed to the collector, after all, was, that he had seen this vessel land goods at *Byram Point*. This, of itself, would not have been enough, perhaps, even to authorize a seizure. It amounts to more, but not a great deal more, than the information given by *Ferris* to the plaintiff. Both *Mead* and the plaintiff proceeded upon suspicion; and the plaintiff having seized the vessel, and then possessed himself of information more unequivocally showing that the *Hiram* was a smuggler, by the detection of the concealed goods, I think, upon the whole, his right to participate in the proceeds of this forfeiture is entitled to a preference over that of *Mead*. Next, as to the *Magistrate*:

After a careful examination of the testimony, I cannot discover that the plaintiff has a colour of right to any portion of the proceeds of this vessel and her cargo. That he gave any information, in consequence of which this vessel was either seized or condemned, cannot be pretended. It has been said that it may be inferred from the circumstances that some such information was acquired while *Squires* was on board of her, but there is no foundation for any such inference. After *Squires* boarded the ship, he went down into the cabin, and soon after he and the captain, with the ship's papers, went ashore and repaired to the custom-house, where, according to the testimony of *Schenck*, the information was obtained which led to the final condemnation of the ship and cargo. The only thing which affords even a pretext for this claim is, that the officers and crew seized this vessel. But the mere naked seizure of a vessel by the officers of a revenue cutter, does not give any right to a share of the forfeiture.

The 97th, 98th, and 99th sections of the duty act, show for what purposes revenue cutters are provided, and prescribes the duties which their officers are to perform. The objects for which they are provided, (97th sec.) are stated to be, " for the better securing the collection of the duties imposed on goods, &c. and to be employed for the protection of the revenue, &c. &c. The officers (99th sec.) are declared to be officers of the customs, and to be subject to the directions of the collectors, &c. Their duties, in the same section, are, among others, declared to be, that they shall " go on board all ships and vessels, &c. and search and examine the same, and every part thereof," &c.

From the testimony of *Schenck* and *Sickles*, it appears that the *Active* went in pursuit of the *Magistrate*, by order of the defendant, who had a right to send her on this service, and whose directions it was the duty of the officers to obey. As one of the custom-house officers, and by direction of his superior, he found this vessel, and stopped her ; and for this he is not, by the act of congress, entitled to any part of the forfeiture. The officers of the *Active* did nothing but what was in pursuance of their ordinary and appropriate duty, for which they receive a compensation from the government.

Lastly, as to the *Liberty* :

The circumstances which led to the seizure of this vessel, are shortly these. The defendant entertaining suspicions that her crew intended to run away with her, ordered her to be watched for some time. Their suspicions increasing, he ordered *Squires* to unbend her sails, and carry them ashore, which was accordingly done. On a *Sunday* night, during a violent snow storm, her fasts were cut, and she went off, and run upon *Governor's Island* in the course of the night, and bilged. Thus far the plaintiff had no concern in this transaction. Not long after the ship left the wharf some person informed *Schenck*, the surveyor of the port, of it, who immediately, as it was proper he should do, took measures to stop and bring her back. For this purpose, he went on board the *Active*, and applied to *Gilpin*, the only officer on board, who refused to stir, until he had seen either *Squires*, the first lieutenant, or the defendant, and went ashore avowedly for the purpose of consulting with these gentlemen.

While he was gone, the surveyor went to the defendant's house, where he met *Gilpin*, as he was coming out of it. Whether the officers of the revenue cutter were bound to obey *Schenck* is immaterial; for there is every reason to believe, that the defendant himself directed the *Active* to pursue the ship in question. *Gilpin* set out, but saw nothing of the *Liberty* that night; but in the morning, on returning to the city, she was seen aground upon *Governor's Island*; and soon after, *Squires*, with two men from the *Active*, and two from *Van Beuren's* cutter, the *Protector*, and in company with *Van Beuren*, went on board of her, and seized her.

According to *Van Beuren's* testimony, he was prepared to go on board the *Liberty* before he saw *Squires*; and it is very questionable whether *he* ought not, in fact, to be considered the seizing officer, or at least as much so as *Squires*. On what ground this vessel was condemned does not appear.

The mere seizure of the ship, much less assisting in bringing her cargo ashore, confers no right to a portion of the forfeiture. These, as has already been remarked, are the usual and proper duties of the officers of the revenue cutters. In all the testimony, too, we look in vain for any information given by the officers of the *Active*, in " consequence of which this forfeiture was recovered." Not a single fact was known or discovered by them leading to such a result, directly or indirectly. Indeed, it appears to me, that the verdict in both the last two causes is wholly unsupported by the evidence.

The defendant appears, in both cases, to have received " information" from other persons, which led to the seizure and final condemnation of the ships, and their cargoes; and those persons only are entitled to share the proceeds with the *United States.*

The result is, that there must be a new trial; and as it may be material that another point, made by the defendant's counsel, should be put at rest by the court, I proceed briefly to consider it. I allude to the effect of the settlement of this transaction by the defendant with the treasury department. These vessels and their cargoes were all condemned in the district court of *New-York,* and sold by the marshal.

The 90th sec. of the duty act, after directing that all ships, &c. condemned, &c. shall be sold at public auction by the

marshal, provides, that the marshal shall pay the amount of such sales, deducting all proper charges, to the clerk of the court directing such sale, to be by him *(after deducting the charges allowed by the court,)* paid to the collector of the district. By the 89th sec. it is made the duty of the collector, to cause suits to be brought for all infractions of the act, and prosecuted to effect; and he is " authorized to receive from the court within which such trial is had, or from the proper officers thereof, the sum or sums so recovered, *after deducting all proper charges to be allowed by the said court;*" and on receipt thereof, the collector shall *pay and distribute* the same, without delay, according to law, and transmit, quarter-yearly, to the treasury, an account of all monies received by him for fines, penalties, and forfeitures, during such quarter." From these provisions of the act of congress, it will be seen, that the collector received the net proceeds of these vessels and cargoes, all the costs and charges having been allowed and taxed by the court; that he is made the agent for all parties who have an interest in the forfeiture, and is to pay and distribute the money when received, and that he is to account at the treasury, quarter-yearly, for all the money received for fines. I am persuaded that it is enough to state the case, to show that the settlement made at the treasury ought to have been received as a *prima facie* evidence, at least, of its fairness and correctness. This, however, would not form a ground for a new trial, as the plaintiff offers to remit the sum which ought to have been deducted; the amount being stated in the case.

There must be a new trial, with costs, to abide the event of the suit.

New trial granted.